Peter J. LIMONE, et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

Joseph Salvati, et al., Plaintiffs,

v.

United States of America,
et al., Defendants.

Edward Greco, Plaintiff,

v.

United States of America,
et al., Defendants.

Nos. CIV.A. 02–10890–NG, CIV.A. 03–11433–NG, CIV.A. 03–10599–NG.

United States District Court,
D. Massachusetts.

Sept. 17, 2004.

---

See also 372 F.3d 39.

James M. Chernetsky, City of Boston Law Department, Boston, MA, for Frank L. Walsh, Defendant.

Thomas R Donohue, City of Boston Law Department, Boston, MA, for Frank L. Walsh, Defendant.

Edwin Durham, Rachlis, Durham, Duff, Adler, Chicago, IL, for Edward Greco, Plaintiff.

Howard Friedman, Law Offices of Howard Friedman, Boston, MA, for Edward Greco, Plaintiff.

Myong J. Joun, Howard Friedman Law Offices, Boston, MA, for Edward Greco, Plaintiff.

Margaret Krawiec, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for United States of America at U.S. Postal Service, Defendant.

E. Peter Parker, One Commercial Wharf North, Boston, MA, for Paul Rico, Defendant.

Michael Rachlis, Rachlis, Durham, Duff, Adler, Chicago, IL, for Edward Greco, Plaintiff.

### MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS

GERTNER, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................. 23

II. LEGAL STANDARD .......................................... 25

III. FACTS ..................................................... 25
 A. Factual History ......................................... 25
 1. Deegan Murder ..................................... 25
 2. Prosecution ........................................ 26
 3. Conviction and Cover–Up ............................ 27
 4. Exoneration ........................................ 28
 5. Procedural History ................................. 29

IV. UNITED STATES' MOTION TO DISMISS AGAINST ALL PLAINTIFFS ..... 29
 A. Malicious Prosecution ................................... 29
 1. Plain Meaning ..................................... 31
 a. The Definitions ................................ 31
 2. Legislative History ................................. 33
 3. Case Law Interpreting § 2680(h) .................... 33
 4. Malicious Prosecution Elements ..................... 36
 5. Post–1974 Misconduct .............................. 37
 B. Derivative Claims ....................................... 38
 C. Discretionary Function Exception ........................ 39
 1. Conduct in Question ................................ 39
 2. Discretionary Decision ............................. 39
 3. Policy Considerations .............................. 41

V. UNITED STATES' MOTION TO DISMISS EDWARD GRECO'S CLAIMS ..... 41
 A. Intentional Infliction of Emotional Distress .............. 42
 1. The Merits of the Claim ............................ 42
 2. Statute of Limitations ............................. 46
 a. The Discovery Rule ............................ 46
 b. Equitable Tolling and Fraudulent Concealment ..... 48
 B. Loss of Consortium ..................................... 48
 C. Civil Conspiracy ....................................... 50

VI. CONDON'S and WALSH'S MOTIONS TO DISMISS ................. 51

A. Claims by Family Members ........................................... 51
B. Qualified and Absolute Immunity on all *Bivens* Claims .................. 53

VII. CONCLUSION ...................................................... 54

This memorandum addresses a second round of motions filed by the defendants, motions which yet again seek to dismiss the plaintiffs' complaints.

The first round was filed at various times in 2003, and resulted in a lengthy decision by this Court on July 17, 2003, *Limone v. United States*, 271 F.Supp.2d 345 (D.Mass.2003), which was affirmed on appeal, 372 F.3d 39 (1st Cir. June 10, 2004).[1] The Court has allowed the government to file these additional motions, presumably raising new jurisdictional issues, but no more.[2] Resolution of these cases has already been delayed far too long.

## I. INTRODUCTION

The background of this case is fully detailed in the Court's prior decision. However, since the specific allegations are so relevant to these motions, they will be outlined yet again. *See Limone*, 271 F.Supp.2d 345.

Plaintiffs accuse the defendants, the United States and various federal[3] and state law enforcement officers, of framing Peter Limone ("Limone"), Henry Tameleo ("Tameleo"), Louis Greco ("Greco"), and Joseph Salvati ("Salvati") for the murder of Edward "Teddy" Deegan ("Deegan") on March 12, 1965. As a result of the defendants' misconduct, these men were convicted of Deegan's murder in 1968 and sentenced to death; sentences that were later vacated and replaced with life imprisonment. By 2000, all charges were dismissed against the plaintiffs then living, amid a flurry of accusations of a government frame-up and cover-up extending over thirty years.

Plaintiffs allege Deegan was killed by Federal Bureau of Investigation ("FBI") informants Vincent "Jimmy" Flemmi ("Flemmi") and Joseph Barboza ("Barboza"), along with Roy French ("French"), Ronald Cassesso ("Cassesso"), and Joseph Martin ("Martin"). According to plaintiffs, the defendants not only withheld this information, but took affirmative steps to keep it hidden during the numerous court and parole proceedings after the trial. Since the defendants wanted to develop Flemmi as an informant, they did not want his participation in the Deegan murders to be known. The result: Limone, Tameleo, Salvati, and Greco were each imprisoned for over thirty years.

The complaints[4] seek damages under a variety of federal and state law causes of

1. The First Circuit heard an interlocutory appeal on my denial of motions to dismiss based on qualified immunity.

2. I made clear at the January 23, 2004, hearing on these motions that defendants would not be permitted interminable rounds of motions to dismiss. I ordered that any additional motions to dismiss had to be filed by February 6, 2004. This decision addresses all remaining motions to dismiss. No further motions will be accepted by the Court.

3. Subsequent to filing these motions, defendant Paul Rico died on January 16, 2004. His attorney has filed a Suggestion of Death [docket entry # 211]. Rico has since been terminated as a party in this case and no personal representative has been appointed. I have granted the plaintiffs' motion to extend time to name Rico's personal representative as a defendant in this case.

4. There are four groups of plaintiffs in this case who have filed separate complaints: the Limone/Tameleo plaintiffs (on behalf of themselves and Henry Tameleo), the Werner plaintiffs, (on behalf of themselves and Louis Greco), plaintiff Edward Greco, and the Salvati plaintiffs. The claims of the Salvati plaintiffs were not addressed in my prior decision. All of these actions have been consolidated. Each set of plaintiffs is pursuing separate

action on behalf of the wrongfully imprisoned individuals and their families.

The United States again insists that the plaintiffs' claims are jurisdictionally barred because the prosecutions and imprisonments at issue occurred prior to the waiver of sovereign immunity under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671–2680. In addition, the government presses a new argument for immunity based on the discretionary function exception to the FTCA.[5] [Limone docket entry # 183, Salvati docket entry # 6]. The United States also filed an additional motion to dismiss the claims of plaintiff Edward Greco, the son of Louis Greco, as time-barred or for failure to state a claim [Greco docket entry # 7].

▮▮▮ Defendants Dennis Condon ("Condon") and Frank Walsh ("Walsh") move separately to dismiss the claims asserted against them individually. Specifically, Condon moves to dismiss the *Bivens* claims brought by the Limone and Tameleo families because they do not allege conduct that was intentionally directed at interfering with the family relationship. [Limone docket entry # 217].[6] Condon asserts the same defense against the Salvati family, and additionally moves that the Salvati complaint be dismissed based on Condon's qualified and/or absolute immunity [Salvati docket entry # 17].[7] Defendant Walsh asserts the same arguments in support of dismissing the *Bivens* claims asserted by the Salvati family [Limone docket entry # 221].

For the reasons discussed below, the United States' motions to dismiss are **DENIED** (Limone docket entry # 183, Salvati docket entry # 6, 7). Walsh's motion is **GRANTED** (Limone docket entry # 221). Condon's motion against the Limone and Tameleo family members is **GRANTED** (Limone docket entry # 217), and Condon's motion against the Salvati plaintiffs is **GRANTED in part** and **DENIED in part** (Salvati docket entry # 17).

---

claims and relief, but I address their claims together in this decision. I draw from the facts alleged in all four complaints.

5. In its previous motion to dismiss, the government argued that plaintiffs' malicious prosecution claims were barred by the discretionary function exception. I rejected that argument. The government now argues that the discretionary function exception bars plaintiffs' claims for negligent selection, supervision, and retention of the individual agents.

6. Condon also moves to dismiss claims by Edward Greco on the same ground [Limone docket entry # 203]. This motion is moot because Edward Greco voluntarily dismissed his claims against Condon [docket entry # 212] and Walsh [docket entry # 227]. None of Louis Greco's other family members assert *Bivens* claims on their own behalf.

7. Condon also moves to dismiss the state law claims asserted against him by the Salvati plaintiffs for false imprisonment, malicious prosecution, loss of consortium and intentional infliction of emotional distress (Counts V–IX). Under the Westfall Act, the Attorney General may certify that a federal employee was acting within the scope of his/her employment at the time of an incident that serves as the basis for a common law tort against the employee. *See* 28 U.S.C. § 2679(d)(1). If the employee is certified, then he or she is immune from common law tort claims arising from certified conduct and the United States is substituted for those claims. *Id.*

In this Court's prior decision in *Limone*, the United States was substituted for several individuals, including Condon, after certification. 271 F.Supp.2d at 365. The Salvati plaintiffs were not part of the case at the time of that decision. Now, the Attorney General has filed a certification of defendants Condon, Rico and Handley in the Salvati case [Salvati docket entry # 28]. Therefore, the claims against these individuals are DISMISSED and the United States is substituted.

## II. LEGAL STANDARD

This case is still at a very preliminary stage. And as I have noted in my first dismissal decision, in adjudicating motions to dismiss under Fed.R.Civ.P. 12(b)(6), I must accept all allegations in the complaints as true and all reasonable inferences must be drawn in favor of the plaintiffs. *See Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1st Cir.1994). The complaints should be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## III. FACTS

### A. Factual History

Agents Paul Rico ("Rico") and Dennis Condon ("Condon") were partners working out of the Boston FBI office with responsibility for investigating organized crime in New England. In the course of their work, they cultivated a number of relationships with confidential informants, including Flemmi and Barboza. Rico, Condon, other agents, and their supervisors, including Special Agent in Charge James Handley, "failed to follow proper procedures and guidelines" in handling these informants. Specifically, the agents knew that, notwithstanding their relationship with Flemmi, he kept on committing murders. Indeed, as early as May 22, 1964, the agents were told about a Flemmi comment—"all [he] wants to do now is kill people" and that his stated aspiration was to become the number one "hit man." Again, on March 3, 1965, the agents were advised that alleged crime boss Gennaro J. Angiulo had warned another alleged mobster, Raymond Patriarca, that Flemmi "did not use sufficient common sense when it came to killing people."

Six days later, on March 9, 1965, less than a week before Deegan's murder (the man the plaintiffs were accused of killing), defendants and their supervisors were aware that Flemmi was in line to be a "Top Echelon" informant just when he was also "believed to be involved in the murders" of several persons.

### 1. Deegan Murder

In fact, the FBI's information was even more precise with respect to the Deegan murder. The FBI received information during 1964 and 1965 alerting them that Flemmi intended to kill Deegan. Agent Rico wrote in an October 19, 1964, memorandum that an informant reported that Flemmi wanted to kill Deegan and had asked the informant to go with him on the "hit." A memorandum from the Boston Office of the FBI to the Director of the FBI dated March 10, 1965, disclosed an informant's report that Flemmi and Barboza had contacted Patriarca to get his "OK" to kill Deegan. That same day, another informant told Rico that Flemmi believed Patriarca approved the "hit" and that a "dry run" had been made. Neither Rico, Condon, Handley, nor any other FBI agents warned Deegan or took steps to prevent their informants, Flemmi and Barboza, from carrying out the plan.

Deegan was killed on March 12, 1965. The next day, an informant told Rico that Flemmi had confessed his (Flemmi's) role in the crime, together with Barboza, French, Cassesso, and Martin. Rico memorialized this information in a report that was transmitted to Officer Renfrew, then a captain in the Chelsea Police Department. On March 23, 1965, the FBI received information, which it deemed to be "very good," from an informant that Barboza claimed to have shot Deegan with a .45 caliber handgun, one of the weapons the FBI knew was involved in the murder. The informant also reported that Roy French was with Deegan when he was shot by Barboza,

together with two other individuals, one of whom the informant believed was Romeo Martin.

An FBI memorandum dated March 19, 1965, notes:

> Informants report that Ronald Casessa, Romeo Martin, Vincent James Flemmi, and Joseph Barboza, prominent local hoodlums, were responsible for the [Deegan] killing. They accomplished this by having Roy French, another Boston hoodlum, set Deegan up in a proposed 'breaking and entering' in Chelsea, Mass. French apparently walked in behind Deegan when they were gaining entrance to the building and fired the first shot hitting Deegan in the back of the head. Casessa and Martin immediately thereafter shot Deegan from the front.

The State and Chelsea Police Departments had reports similar to those discussed above.

None of this information was revealed either during the prosecution or the lengthy post-conviction proceedings of Limone, Greco, Salvati, and Tameleo.

### 2. Prosecution

In the spring of 1967, FBI agents including Rico and Condon arranged to meet with Barboza. They induced Barboza to cooperate with their investigation of the Deegan murder by conveying false information to him that supposedly caused him to fear for his life. As a result, Barboza told the agents that he would not, under any circumstances, implicate Flemmi in the murder. Instead, Barboza falsely implicated Greco, Limone, Salvati, and Tameleo. The agents continued to develop Barboza as a witness even though their information plainly contradicted his account of the Deegan murder.[8]

Rico, Condon, and Walsh took a formal statement from Barboza on September 12, 1967. As he promised, Barboza did not implicate Flemmi. In addition, he claimed that it was Greco who shot Deegan with the .45 caliber handgun—a statement that contradicted the credible informant information. In a word, Barboza intended to perjure himself before the grand jury investigating the Deegan murder, and Rico and Condon knew it.

Barboza testified before the grand jury on October 25, 1967; an indictment was handed down the same day. Prior to his testimony, Rico and Walsh took at least one additional statement from Barboza in which he contradicted himself in several material respects concerning Greco's alleged involvement. Barboza had stated that Greco left the Ebbtide Restaurant on the night of the murder with the .45 handgun in his possession; that Greco was wearing a brown topcoat; and that after the murder, Greco returned to the Ebbtide Restaurant and informed Barboza that he (Greco) was among those who had killed Deegan. On October 16, 1967, however, Barboza stated to Rico and Walsh that Greco did not come into the Ebbtide Restaurant at all on the night of the murder; that he did not remember what Greco was wearing; and made no mention of any "admission" by Greco. None of the documents memorializing these contradictory

---

8. Plaintiffs' Complaints describe these allegations in different ways. Specifically, the Salvati Complaint alleges that Barboza told Rico and Condon that he would falsely testify that Salvati and not Flemmi was a participant in the murder because Salvati had borrowed $400 from a friend of Barboza's and had not repaid the debt and that Salvati had "disrespected" Barboza. The Limone/Tameleo Complaints only state that the agents knew Flemmi was involved. The Werner Complaint states that the agents knew Barboza would commit perjury by testifying that Flemmi was not involved in the murder and by implicating Greco and other innocent persons in the murder.

statements were revealed before 2000, nearly forty years later.

Prior to the trial, Rico, Condon, and Walsh arranged a meeting between Barboza and Anthony Stathopolous, who was with Deegan at the time of the murder. Previously, Stathopolous claimed to have seen only Cassesso and Martin at the murder scene. After this meeting, however, Stathopolous claimed—for the first time—that the man with the gun looked like Greco. Barboza also told Stathopolous that he intended to keep Flemmi out of the Deegan murder trial and directed him not to mention Flemmi at all.

Also prior to the trial, Boston Police Officer Frank Walsh interviewed a witness in Florida who provided an alibi for Greco. The witness, Barbara Brown, cared for Greco's children when Greco was in Florida. She showed Walsh a calendar indicating that she was with Greco's children on the night of the Deegan murder. Walsh falsely claimed that no such calendar existed.

In short, the state prosecution of Limone, Greco, Salvati, and Tameleo was procured by the FBI and nurtured by both federal agents and state officers who knew that the charges were bogus. None of the agents or supervisors involved took steps to stop the prosecution. Indeed, they did just the opposite: A July 31, 1968, memorandum addressed to the Director of the FBI recommended that letters of commendation be issued for the Suffolk County District Attorney and staff as well as Rico and Condon, particularly in light of Condon's testifying "in an excellent manner in this case."

### 3. Conviction and Cover–Up

In 1968, Greco, Limone, Salvati, and Tameleo were convicted of the Deegan murder in the Superior Court of Suffolk County, Massachusetts. Greco, Limone, and Tameleo received death sentences, later vacated and replaced with sentences of life imprisonment. Salvati was convicted of accessory before the fact and two counts of conspiracy; he was sentenced to life imprisonment.

Plaintiffs allege that at various times from the murder of Deegan to the present, FBI agents Rico, Condon, John Morris, and John Connolly, other employees of the Department of Justice and FBI, and Officers Walsh and Renfrew, took affirmative steps to cover up the facts and to keep secret evidence that would exculpate Limone, Tameleo, Salvati, and Greco.

In or about 1970, Barboza recanted his trial testimony against the four men in statements to James Southwood, William Geraway, Attorney F. Lee Bailey, and Attorney Gerald Alch.[9] Defendants induced Barboza to withdraw his recantation and affirm his earlier false trial testimony by promising to arrange for his release from prison. In 1971 and 1972, Rico and Condon continued to help Barboza in order to ensure his silence, even going so far as to intercede on his behalf in a California first-degree murder prosecution. Barboza was permitted to plead guilty to second-degree murder and was sentenced to only five years' imprisonment. He was released after serving less than three years.

In 1982, with the support of the Deegan family who believed in his innocence, Li-

---

9. Bailey testified about his conversation with Barboza before a Congressional panel in 2000. According to Bailey, Barboza said that when Rico and Condon questioned him about the Deegan murder, he told Rico and Condon directly that he would falsely implicate persons whom the FBI wanted to be convicted of murder if the FBI permitted him, in turn, to falsely implicate other persons whom he wanted incarcerated. One way or the other, plaintiffs allege that Barboza falsely implicated Greco, Limone, Salvati, and Tameleo in the murder.

mone filed a petition to commute his sentence. Defendants stonewalled, continuing to withhold information that would have exonerated Limone. Indeed, agents Morris and Connolly attempted to discourage members of the Massachusetts Advisory Board of Pardons from recommending commutation for Limone by providing false information directly and through then U.S. Attorney William Weld.

Notwithstanding this pressure, on August 1, 1983, the Board voted to recommend commutation of Limone's sentence. FBI agents, including Morris and Connolly, then channeled false information to the office of the Governor to dissuade him from approving the commutation petition. It worked. On September 20, 1983, Governor Dukakis denied the petition.

FBI agents, including Morris and Connolly, went so far as to cause state law enforcement officials to investigate members of the Advisory Board of Pardons who had voted in favor of commutation to determine if they were influenced by organized crime. On December 21, 1987, the Board unanimously denied a hearing on a subsequent petition for commutation by Limone, after receipt of more false information from defendants.

In 1983 and 1986, Greco also applied for commutation of his sentence. Again, on each occasion, the Board recommended commutation. Again, FBI agents sought to discourage Governor Dukakis in 1985, and Governor Weld in 1993, from granting the petition. As a result, Greco's petition was turned down.

Salvati filed no fewer than five petitions for commutation of his sentence, an appeal of his conviction to the Massachusetts Supreme Judicial Court, and a motion for a new trial. In 1986, four of the seven members of the Parole Board voted to grant Salvati a hearing on his application. At a closed door session in 1986, the Parole Board Chair, John Curran, told the Board that unnamed FBI agents informed him that Salvati was under federal investigation and possible indictment for involvement in a Boston loan-sharking operation run by an ex-convict named Frank Oreto. Curran recommended that Salvati be denied a hearing. Based on that information, the Parole Board rescinded its prior vote. It voted unanimously to deny Salvati a hearing. The information provided by the FBI agents was false; Salvati was never indicted; rather Oreto was indicted in June of 1987.[10]

Throughout all of these post-trial proceedings, plaintiffs' attorneys requested exculpatory evidence. No information was disclosed until December 2000, when FBI documents and other evidence were released in connection with an unrelated criminal prosecution.

### 4. *Exoneration*

Tameleo and Greco died in prison in 1985 and 1995, respectively, prior to the time when the facts recounted above came to light. Salvati was released after his sentence was commuted on March 20, 1997, but remained on parole until January 30, 2001. Limone stayed in prison until January 5, 2001. His conviction was vacated and a new trial ordered on January 8, 2001. Salvati's conviction was also vacated in January 2001.

On January 30, 2001, the Suffolk County District Attorney's Office announced that it would drop all proceedings against both Limone and Salvati. In a written *nolle prosequi*, the District Attorney's Office stated that newly discovered evidence, in-

---

**10.** Tameleo's Complaint in this case does not detail the steps he took to reverse his conviction before his death in prison in 1985.

cluding FBI documents, had undermined the credibility of Barboza, the Commonwealth's principal witness, and the Commonwealth's theory of the murder. After a thorough review of the facts, the Commonwealth noted that it "does not now have a good faith basis—legally or ethically—to proceed with any further prosecution of the defendant." [11]

### 5. Procedural History

In July 2003, this Court denied defendants' first round of motions to dismiss. *See Limone,* 271 F.Supp.2d 345. I found that (1) the FTCA's discretionary function exception did not apply to plaintiffs' malicious prosecution claims; (2) plaintiffs satisfied the initiation and favorable termination requirements necessary to their malicious prosecution claims; (3) plaintiffs' claims for intentional infliction of emotional distress were not jurisdictionally barred because they did not "arise out" of intentional torts barred by FTCA; (4) plaintiffs' factual allegations regarding FBI agents' statements to the Board of Pardons were not barred by the FTCA's failure to waive immunity for libel and slander because such factual claims provide support for their malicious prosecution claim; (5) plaintiffs' conspiracy claims were not barred because the underlying tort claims were not dismissed; and (6) defendants Rico, Condon, and Walsh were not entitled to qualified or absolute immunity.[12]

Defendants' new arguments for dismissal of the claims against them are equally baseless, with a few exceptions noted below.

### IV. UNITED STATES' MOTION TO DISMISS AGAINST ALL PLAINTIFFS

#### A. Malicious Prosecution

██ It is axiomatic that claims for damages against the United States (as opposed to claims against individual defendants) may be maintained only to the extent that the government has consented to be sued. The FTCA sets forth the categories of actions for which the government has agreed to waive its traditional immunity. *See* 28 U.S.C. § 1346(b). What the government is arguing here is that plaintiffs' claims fall outside the area covered by that waiver and are thus jurisdictionally barred.

Before 1974, the FTCA waived the government's sovereign immunity only for negligent actions of government agents acting within the scope of their employment—not for intentional torts. The government's position changed on March 16, 1974, after a series of highly publicized and plainly illegal home raids by federal agents in Collinsville, Illinois, *see* 1974 U.S.C.C.A.N. 2789, 2791 (1973). On that date, Congress amended the FTCA, consenting to be sued for certain intentional torts committed by federal law enforcement agents, the kind of official misconduct widely maligned in the Collinsville raids. But to avoid opening the floodgates to historical claims, what the 1974 amend-

---

**11.** Although the Salvati Complaint does not specifically quote from the *nolle prosequi* issued in January 2001, since the charges against both Limone and Salvati were dropped in the same court on the same day, I assume that Salvati was named in the same *nolle prosequi.*

**12.** The Court did dismiss all state law claims brought by the Limone, Tameleo, and Werner plaintiffs against agents Rico, Handley, and Condon and substituted the United States as the defendant on these claims because the Attorney General certified that the agents were acting within the scope of their employment during the incidents alleged. Under the Westfall Act, such certification provides immunity to the individual officers. 28 U.S.C. § 2679(d)(1); *Lyons v. Brown,* 158 F.3d 605 (1st Cir.1998).

ment announced—in less than clear legal language—was that, in effect, from now on the government would allow itself to be sued for certain intentional torts.[13] The government argues that plaintiffs' fall within the pre-amendment regime and thus, are barred. Plaintiffs situate their case in the proviso—the "from now on" clause.

The statute uses the words "claim arising on or after" to convey the idea that the provision is prospective. The government interprets these words to apply to *acts* alleged to have been committed by officials, not to *claims*, which are contingent on a host of legal factors. The acts at issue, they insist, are the "acts or omissions" of the law enforcement officers before and during the 1968 trial. As such, plaintiffs' claims would have *arisen* before the government's waiver of sovereign immunity.

Plaintiffs counter that the term "claim arising on or after" is a legal concept, which refers to the date on which their claims could have been brought to court. The word "arise," they argue, is synonymous with the word "accrue." Thus, their causes of action *arose* in 2000 when Limone, Salvati, Greco, and Tameleo's convictions were vacated (or constructively reversed). Only then, having received the favorable termination essential to a mali-

cious prosecution claim, could the plaintiffs have brought suit.[14] In the alternative, plaintiffs contend that even if the FTCA is interpreted as the government suggests the government's motion should still fail. Plaintiffs *have* alleged post–1974 misconduct, i.e. defendants' thirty-year active cover-up of the FBI's misdeeds. The malicious prosecution claim, they allege, both legally and factually straddles the date of the FTCA amendment.

I agree with plaintiffs. I do not have to delve too deeply into the linguistic thicket of what the phrase "claims arising on or after" means in § 2680 because of the nature of malicious prosecution in general and the unique facts of this case. First, while most intentional torts—including those listed in the 1974 amendment— "arise" and "accrue" at the same time, a malicious prosecution claim requires an additional, later act to occur, namely that the plaintiff's conviction be terminated in his favor. Unlike a plaintiff who claims that he or she was wrongly assaulted by an officer, who can proceed to court the moment after the punch lands, plaintiffs here had to wait thirty years before all elements of the claim were in place. It was not until 2000 that there was a favorable termination of their cases and their collective nightmare ended. Whatever "arise" means in other settings, for other inten-

---

**13.** The relevant portion of 28 U.S.C. § 2680 states:

> The provisions of this chapter and section 1346(b) of this title shall not apply to -
> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: Provided, that, with regards to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising on or after the date of this proviso, out of assault, battery, false im-

> prisonment, false arrest, abuse of process, or malicious prosecution. For purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h).

**14.** As discussed *infra*, the Supreme Court has held that a cause of action for malicious prosecution does not accrue until after the plaintiff's conviction has been terminated in his favor. *Heck v. Humphrey*, 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

tional torts, in the context of malicious prosecution, it has to include the occurrence of all elements comprising the tort.

Second, even if I were to accept the government's fact-based argument, plaintiffs' claims still survive. The government's argument that the core misconduct—the 1968 conviction—determines when the claims "arose," ignores the post-1974 acts of misconduct, which are no less important. They have alleged affirmative acts by law enforcement officers designed to cover up the wrongful prosecution time after time, in legal proceeding after legal proceeding. This was more than a continuing violation of their rights by FBI agents passively standing by as they rotted in jail. This was a veritable campaign by the defendants to ensure that the real perpetrators were never prosecuted.

In addressing the government's motion, I begin with the plain language of the statute (section 1), the legislative history of the proviso (section 2), other court decisions (section 3), the elements of malicious prosecution (section 4) and finally, the acts which plaintiffs claim occurred after the 1974 amendment (section 5).

## 1. *Plain Meaning*

In the absence of a statutory definition, courts construe a statutory term in accordance with its ordinary or natural meaning. *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

### a. *The Definitions*

Black's Law Dictionary defines "arise" in three different contexts: "1. To originate; to stem (from) <a federal claim arising under the U.S. Constitution>. 2. To result (from) <litigation routinely arises from such accidents>. 3. To emerge in one's consciousness; to come to one's attention <the question of appealability then arose>." *Black's Law Dictionary* (8th ed.2004). These definitions seem to comport with plaintiffs' argument. The first definition addresses the derivation of a *legal* claim. The second and third definitions address where and when a *legal* claim originates. Black's defines "accrue" to mean "1. To come into existence as an enforceable claim or right; to arise <the plaintiff's cause of action for silicosis did not accrue until the plaintiff knew or had reason to know of the disease.> ..." *Id.* While less than clear, these definitions give some support to plaintiffs' view that "arise" and "accrue" can be synonymous—both have legal not factual content. Both refer to when legal rights may be enforced in court.

The use of the term "claim" in § 2680(h) provides further support for the view that Congress was referring to an enforceable *legal right.* Black's defines "claim" to mean:

1. The aggregate of operative facts giving rise to a right enforceable by a court <the plaintiff's short, plain statement about the crash established the claim.> ... 2. The assertion of an existing right ... <the spouse's claim to half of the lottery winnings>. 3. A demand for money, property, or a legal remedy to which one asserts a right; esp. the part of a complaint in a civil action specifying what relief the plaintiff asks for.

*Id.* As described *infra,* plaintiffs did not have an enforceable *legal right* or claim until they received favorable termination to their convictions—well after 1974—because they could not have brought an action for malicious prosecution until that point.

But while the dictionary definition of "arise" and "accrue" suggests one interpretation of § 2680(h), the government argues that the words have a different meaning in the four corners of the provision. In the other parts of § 2680, which define claims exempt from waiver, Congress uses

the term "arise" linked to claims that follow specific official acts—the loss of mail (§ 2680(b)), the assessment of a tax (§ 2680(c)), or certain generic categories of acts, the *combatant activities of the military* (§ 2680(j)), the activities of the Tennessee Valley Authority (§ 2680(1)).[15] Likewise, the government argues, the claims at issue in § 2680(h) are those that follow specific acts—here the act of an alleged wrongful conviction.

But § 2680(h) is more complex than the other sections. Each of the other lettered sections exclude *all* of the acts described from suit—*all* combatant activities, *all* activities of the TVA, etc. It does not matter if the tort involving those activities began pre–1974, and continued afterwards. Section 2680(h), however, purports to distinguish between those intentional torts that are barred, and the proviso, which carves out some of the same torts post–1974 that are actionable. Thus, the government's analysis does not adequately address cases—as here—that involve conduct that begins before 1974 but continues afterwards. Nor does it deal with complex intentional torts like malicious prosecution

whose elements—legal and factual—straddle the proviso's effective date.

The government also points to the use of the terms "arise" and "accrue" elsewhere in the FTCA. In 28 U.S.C. § 1346(b)(1), for example, the statute states that the courts have exclusive jurisdiction over "civil actions or claims against the United States, for money damages, *accruing* on and after January 1, 1945, for injury or loss of property ...." (Emphasis added). Congress used the same language in setting the statute of limitations under the FTCA in 28 U.S.C. § 2401(b): "A tort claim against the United States shall be forever barred unless it is presented in writing .... within two years after such claim *accrues* ...." (Emphasis added). In each case, "accrue" refers to legal claims, not to the occurrence of specific acts.[16] When Congress amended the FTCA in 1974, so the argument goes, it intentionally used a different word, namely "arise" than the word it had used before. It intended to convey a different meaning.

There is also another interpretation. If Congress had intended to waive immunity only for specific acts occurring after 1974,

---

**15.** 28 U.S.C. § 2680 states:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—. . . (b) Any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter. (c) Any claim arising in respect of the assessment of collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs . . . (e) Any claim arising out of an act or omission of any employee of the Government in administering the provisions of sections 1–31 of Title 50, Appendix . . . (j) Any claim arising out of the combatant activities of the military . . . (l) Any claim arising from the activities of the Tennessee Valley Authority. (m) Any claim arising from the activities of the Panama Canal Company.

(n) Any claim arising from the activities of a Federal land bank . . .

**16.** Several courts have interpreted the FTCA's effective date provision to apply to "when the claims accrued rather than when the allegedly tortious conduct occurred." *W.C. & A.N. Miller Co. v. United States*, 963 F.Supp. 1231, 1237 (D.D.C.1997)(finding FTCA applied to injuries to property discovered after January 1, 1945—the FTCA effective date—but caused by Army's burial of munitions on property before 1945)(citing *Carnes v. United States*, 186 F.2d 648 (10th Cir.1951)(FTCA permitted suit when child who took home an explosive device from a crashed Army airplane in 1944 was injured in February 1945 when device exploded); *In re Silver Bridge Disaster Litigation*, 381 F.Supp. 931 (S.D.W.Va.1974)(negligence claim based on Army's building bridge in 1928 accrued in 1967 when the bridge collapsed)).

it would have been easy for it to have said so—i.e. "acts or omissions of law enforcement officers occurring on or after" a given date. Instead, it used language laden with legal meaning—i.e. "claims arising on or after." It is just as reasonable to believe "arise" and "accrue" are synonymous in the statute, as the plaintiffs suggest, as the opposite. Or, as described below, just because the word "accrues" has a certain legal meaning in statute of limitations contexts (i.e., when the plaintiff discovers the wrong) does not mean that the word "arise" paired with the word "claim" has *no* legal connotations. *See* section 3, *infra.*

### 2. *Legislative History*

Given the provision's ambiguity, especially as applied to malicious prosecution, it is appropriate to look to legislative history for guidance. *See United States v. Fisher*, 2 Cranch 358, 6 U.S. 358, 400, 2 L.Ed. 304 (1805). Congress sought to amend the FTCA in response to a series of abusive and unconstitutional "no-knock" raids by Federal narcotics officers.[17] It was disturbed that the victims of these raids had no legal remedy to redress their harms, finding *Bivens* remedies against individual officers insufficient because they were often judgment-proof. Thus, Congress provided a counterpart to *Bivens* and its progeny by waiving sovereign immunity for certain intentional torts committed by law enforcement agents. Thus, the legislative history states "after the date of enactment of this measure, innocent individuals who are subjected to raids of the type conducted in Collinsville, Illinois, will have a cause of action against individual Federal agents and the Federal Government." 1974 U.S.C.C.A.N. 2789, 2791 (1973).

The government argues that this language indicates Congress' intent to create only prospective relief. True enough where the plaintiff's injury is immediately apparent and actionable. But malicious prosecution claims are different, as described *infra.* Indeed, in light of Congress' concerns for the innocent victims of the Collinsville raids, it is inconceivable that it would have meant to exclude a sustained post–1974 effort by government officers to keep plaintiffs behind bars for crimes that the officers knew they did not commit.[18]

### 3. *Case Law Interpreting § 2680(h)*

Very few federal courts have addressed the meaning of "arise" in the context of § 2680(h). Most have not discussed the

---

**17.** During these raids, federal agents kicked in the doors of individuals' homes without warning, shouted obscenities and threatened the occupants with drawn weapons. After a brief period of terrorizing the inhabitants and ransacking the homes, the agents realized they entered the wrong homes and left without a word of apology or explanation. The history of the Collinsville, Illinois raids is fully detailed in *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretive Analysis,* 54 N.C.L.Rev. 497, 500 (1976).

**18.** In an examination of the legislative history of the broader act, the three objectives most often mentioned are: "ensuring that 'certain government activities' not be disrupted by the threat of damage suits; avoiding exposure of the United States to liability for excessive or fraudulent claims; and not extending the coverage of the Act to suits for which adequate remedies were already available." *Kosak v. United States,* 465 U.S. 848, 858, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984). Adopting plaintiffs' interpretation of the act would not offend any of these rationales: (1) government activities would not be disrupted because of the unique facts at issue; (2) for the same reason, this case does not expose the government to excessive or fraudulent claims; and (3) plaintiffs do not possess an alternative remedy against the United States, as Congress itself indicated in the legislative history to § 2680(h), because *Bivens* claims alone are usually insufficient to rectify government misconduct because they are against individual officers who are often judgment-proof.

**34**

term at any length, and none considered a malicious prosecution claim.[19] While the early cases support the government's argument, they make cursory mention of § 2680(h) and offer no interpretation of "arise" in connection with a malicious prosecution claim. *See Gaudet v. United States*, 517 F.2d 1034 (5th Cir.1975)(two page decision affirming dismissal of false arrest, assault, and malicious prosecution claims because underlying acts occurred before March 16, 1974); *Dupree v. Village of Hempstead*, 401 F.Supp. 1398 (E.D.N.Y. 1975)(two page decision granting motion for summary judgment on false arrest and imprisonment claims because wrongdoings occurred before amendment); *see also Pennington v. United States*, 406 F.Supp. 850, 851 (E.D.N.Y.1976)(three page decision only assessing negligence claim against United States because assault and battery occurred in 1973).

The government relies on two later decisions, *Liuzzo v. United States*, 508 F.Supp. 923 (E.D.Mich.1981), and *Diminnie v. United States*, 728 F.2d 301 (6th Cir.1984), but they are not applicable. In *Liuzzo*, children of a civil rights worker who was murdered in 1965 by a group of Ku Klux Klan members including one FBI informant, brought suit against the United States for its role in the murder and its negligent failure to supervise the informant. To the extent the complaint alleged the government's wrongful participation in the murder, it was barred by § 2680(h); the government could not be liable for an assault and battery before the effective date of the amendment. To the extent that the claims involved negligent supervision, however, the claims were not barred. The government had waived its immunity for negligence with the initial passage of the FTCA in 1945. *Liuzzo v. United States*, 485 F.Supp. 1274, 1283 (E.D.Mich. 1980). In interpreting the word "arise" as applied to the government's direct participation in the murder, the Court distinguished the term "arise" in connection with waivers of a sovereign immunity claim from "accrue" for the purpose of evaluating the statute of limitations:

> [W]hen a claim 'arises' for the purpose of the proviso to 28 U.S.C. § 2680(h) bears no relationship to when a claim 'accrues' under the FTCA statute of limitations, 28 U.S.C. § 2401(b). The considerations and factors relevant to the accrual of a claim, and thus when a plaintiff must file his claim, do not affect whether or when Congress might decide to waive sovereign immunity for a claim. While due diligence is required in pressing a recoverable claim, Congress is certainly free to set an effective date for the waiver of sovereign immunity in this type of situation, and no amount of diligence on plaintiff's part can alter the fact that the wrong occurred prior to the date that immunity was waived.

*Liuzzo*, 508 F.Supp. at 927–28 n. 2.

But even if the word "accrue" is laden with statute of limitations concerns, like a plaintiff's diligence in bringing a claim, and the word "arise" is not, the government overstates the argument.[20] Just because

---

**19.** The favorable termination requirement was not even fully developed when these cases were decided. *See Heck*, 512 U.S. 477, 483–84, 114 S.Ct. 2364, 129 L.Ed.2d 383.

**20.** In any event, the Salvati plaintiffs argue that the date their claims "arose" should be tolled because of the fraudulent concealment of the underlying facts by the defendants. To be sure, in an ordinary case, fraudulent concealment may relate only to the statute of limitations issues and not sovereign immunity waivers. *Liuzzo*, 508 F.Supp. at 927–928; *Heinrich v. Sweet*, 118 F.Supp.2d 73, 80 (D.Mass.2000)(holding "a tolling provision, whether it be fraudulent concealment or the discovery rule, does not alter the date on which the action arose" in finding that plaintiff's wrongful death claim under Massachusetts law arose at the time of death even if it accrued at a later date), *rev'd on other grounds* 308 F.3d 48 (1st Cir.2002). However, in this

"accrue" has those connotations does not mean that "arise," particularly if paired with the word "claim," is devoid of any reference to legal rights. There is surely a difference between plaintiffs who cannot go to court because they have not met the elements of a tort and plaintiffs who cannot go to court because they are unaware that a tort has been committed or who committed it. In the former, the plaintiff simply cannot sue because his claim is not actionable. In the latter—like *Liuzzo*—the plaintiff has a ripe claim, but does not know it. With malicious prosecution, plaintiffs do not have a legal right or claim until their convictions are vacated. What they knew or suspected before that point is irrelevant.

The government's reliance on *Diminnie* is equally unpersuasive. In *Diminnie*, the Sixth Circuit affirmed summary judgment for the defendant on the plaintiff's assault, battery, false imprisonment, and malicious prosecution claims because they "all *accrued* at the time of the original arrest and indictment in 1973, and thus prior to the 1974 amendment ...." (emphasis added) 728 F.2d at 303. I decline to read into this sentence the significance that either party attaches to it. Defendant was prosecuted for sending extortion letters and threatening to blow up buildings or planes. He was arrested and indicted in 1973, and convicted in 1975. Prior to sentencing, an ATF agent confessed to having authored the letters. The trial court found plaintiff had not alleged the elements of malicious prosecution against either the government or the agent. The latter had no role in initiating the prosecution. The former, since it did not know the agent was culpable, had probable cause to charge plaintiffs. The claim against the government fell on the merits not the vagaries of sovereign[21] immunity or statute of limitations law. *Diminnie v. United States*, 522 F.Supp. 1192, (E.D. Michigan.1981).[22]

The government also points to the Supreme Court's discussion of the § 2680(c) exception for claims "arising in respect of ... the detention of any goods or merchandise by any officer of customs." *See Kosak v. United States*, 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (barring suit by individual for injury to his belongings while they were in Customs Services' custody). The Court interpreted "arising in respect of" to mean "arising out of" and analyzed the phrase in terms of the conduct it addressed. 465 U.S. at 857, 104

---

case the issue is murkier. The agents were not just concealing what they had done in 1968; they compounded it with new misconduct after 1974. I do not have to resolve the issue since I conclude that the malicious prosecution claim, as a matter of law and fact, did not "arise" until after 1974 because of new efforts to keep the plaintiffs from being exonerated.

21. In any case, *Diminnie* was decided before the Supreme Court's decision in *Heck v. Humphrey*, which gave special significance to the favorable termination element. *See infra* section 4. Moreover, central to the court's conclusion in *Diminnie* was the fact that there had been no fraudulent concealment of the misconduct by defendants. Obviously, that does not apply here.

22. Plaintiffs cite to *Ames v. United States*, 600 F.2d 183 (8th Cir.1979). In *Ames*, the Court affirmed the dismissal of the plaintiff's complaint for abuse of process, false arrest and false imprisonment because the only acts and omissions upon which liability could have been based—plaintiff's arrest, confinement and indictment—occurred prior to March 16, 1974. 600 F.2d at 185. But, in a separate analysis, the Court disposed of plaintiff's malicious prosecution claim. The Court noted that since Ames failed to show how the government acted improperly prior to the grand jury indictment, the complaint lacked an essential element of malicious prosecution. While plaintiffs try to tease out the holding that pre–1974 conduct could still support a malicious prosecution claim, the opinion says no such thing. It simply does not address the issue with which this decision is concerned.

S.Ct. 1519. As noted above, while the selected language provides some support for the government's position, the Court did not address this language in the context of *when* a claim arises because these provisions, unlike § 2680(h), do not distinguish between "conduct before" and "conduct after" a given date. *See also Sosa v. Alvarez–Machain,* —— U.S. —— ——, 124 S.Ct. 2739, 2749, 159 L.Ed.2d 718 (2004) (assessing § 2680(k) foreign country exception and finding "arising in" referenced place where harm occurred).

This District's interpretation of "arise" and "accrue" outside the FTCA context provides some support for plaintiffs' argument. In *Ellis v. Ford Motor Company,* 628 F.Supp. 849 (D.Mass.1986), the Court analyzed whether a 1981 amendment to the statute of limitations for Massachusetts wrongful death claims applied to the plaintiffs' claims. The decedent was injured in an auto accident in 1973 but did not die until 1983. The statute in existence at the time of the accident barred wrongful death actions where the death did not occur within two years of the accident. A 1981 amendment eliminated this requirement for all "causes of action arising on or after January 1, 1982." 628 F.Supp. at 853.

The Court found that the amendment applied because plaintiff's cause of action arose on the later date, the date of death, rather than the earlier date, the date of the accident.

The issue is similar to the one at bar: A statute that purports to change the law prospectively, and a claim that did not come into being until all elements of the tort were met, which amounted to years after the original misconduct.

In contrast, the government relies on *Heinrich v. Sweet,* 118 F.Supp.2d 73, 79 (D.Mass.2000) *rev'd on sep. grounds* 308 F.3d 48 (1st Cir.2002). *Heinrich* is distinguishable because like *Liuzzo* it involved claims that were entirely ripe at the time of the injurious conduct but not discovered until years later. At issue was an amendment eliminating a damages cap for wrongful death that applied to "causes of action arising on or after [January 1, 1974]." *Id.* Certain deaths occurred in 1961 but the plaintiffs did not discover the tortious conduct (involuntary human medical experimentation) until 1995. In reliance on Massachusetts law and the distinctions between the terms "arise" and "accrue," the Court found that the action arose when the conduct occurred in 1961, even though it did not accrue (because of tolling provisions) until 1995. *Id.* at 81. The difference between the plaintiffs here and the *Heinrich* plaintiffs is clear.[23] The *Heinrich* plaintiffs had a completed legal claim in 1961; they just did not realize it until 1995.

### 4. *Malicious Prosecution Elements*

■ In any event, malicious prosecution is different from all of the other torts listed in § 2680(h). Most causes of action arise and accrue at the same time—when the harm occurs.[24] A plaintiff claiming

---

**23.** In fact, *Heinrich* is a perfect example of the distinction the Court made in *Liuzzo,* 508 F.Supp. at 927–28 n. 2. The prospective application of the statute is set—it applies to causes of actions arising after January 1, 1974. When the cause of action "accrued" have to do with plaintiff's diligence in finding out about the claim.

**24.** The same is true for the other causes of action included in § 2680(h). To bring a suit for battery, a plaintiff need only allege that

the defendant intended to cause harmful or offensive contact with the plaintiff, or an imminent apprehension of such contact, and a harmful contact resulted. *See Waters v. Blackshear,* 412 Mass. 589, 590, 591 N.E.2d 184 (1992). An assault action requires proof of an attempted battery or putting another in fear of an imminent threatened battery. *Commonwealth v. Gorassi,* 432 Mass. 244, 247, 733 N.E.2d 106 (2000). To bring an abuse of process claim, a plaintiff need only show that: "(1) 'process' was used; (2) for an ulterior or

malicious prosecution, however, must show that the defendant instituted criminal proceedings against him with malice, without probable cause, and that *those proceedings terminated in his favor.* See *Correllas v. Viveiros*, 410 Mass. 314, 318, 572 N.E.2d 7 (1991). Achieving the favorable termination requirement sadly often takes time; in the case at bar, it took over thirty years.

Moreover, this requirement was not a clearly articulated element of the tort until 1994, twenty years after the FTCA amendment. In *Heck v. Humphrey*, 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court underscored the importance of the favorable termination requirement to prevent collateral attacks on convictions. *Id.* at 485–86, 114 S.Ct. 2364. The requirement

> avoids parallel litigation over the issues of probable cause and guilt … and it precludes the possibility of the claimant … succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction.

*Id.* at 484, 114 S.Ct. 2364 (quoting 8 S. Speiser, C. Krause, & A. Gans, *American Law of Torts* § 28.5, p. 24 (1991)). To argue that plaintiffs' claim arose before 1974—over fifteen years before they received "favorable termination" of the charges—would ignore Supreme Court precedent and the policy underlying it.[25]

### 5. *Post–1974 Misconduct*

Even if I were to adopt the government's argument that Congress only waived sovereign immunity for claims arising out of conduct post-dating the amendment, plaintiffs have clearly alleged misconduct—and lots of it—after March 16, 1974.

■ The government counters that plaintiffs' argument is nothing more than a continuing constitutional violation which started in 1968, and relates back to that date. As such, it is not actionable under the FTCA.[26] The argument is extraordinary: Just because the government was lucky enough to commit one horrible act (or series of acts) before 1974—enabling the conviction and life sentence of four innocent individuals—its subsequent thirty years of illegal activity should be immunized as somehow "relating back" to its original misconduct. This argument is both logically, not to mention ethically, flawed.

Plaintiffs cite to authority for holding officers liable for continuing a malicious prosecution. Whoever "takes an active part in continuing or procuring the contin-

---

illegitimate purpose; (3) resulting in damage." *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 775–76, 489 N.E.2d 185 (1986)(quoting *Jones v. Brockton Pub. Mkts., Inc.*, 369 Mass. 387, 389, 340 N.E.2d 484 (1975)). False arrest requires a showing of unlawful confinement by force or threat. *Ortiz v. Hampden County*, 16 Mass. App.Ct. 138, 140, 449 N.E.2d 1227 (1983). False imprisonment requires proof that defendants imposed by force or threats an unlawful restraint on the plaintiff's freedom of movement. *Sarvis v. Boston Safe Deposit & Trust Co.*, 1994 WL 879797, *3 (Mass.Super.1994).

**25.** Indeed, one can argue that the favorable termination requirement is more than just an essential element of the legal claim; it is one of the acts comprising it. The tort of malicious prosecution does not end until there is a favorable termination. If the government believes that only acts are relevant to the determination of when a claim arises, then the acts comprising malicious prosecution continue until plaintiff is exonerated.

**26.** The FTCA does not provide a remedy for Constitutional claims, only those available under local state law. *F.D.I.C. v. Meyer*, 510 U.S. 471, 477–78, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).

uation of criminal proceedings initiated ... by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." *Mitchell v. City of Boston*, 130 F.Supp.2d 201, 215 (D.Mass.2001) (articulating standard for continuing the prosecutions but concluding the facts do not support the claim). *See also* Restatement (Second) of Torts § 655 (1976); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988) (upholding verdict on § 1983 claim for constitutional torts where police continued prosecution by concealing information and misrepresenting facts to prosecutors before charges dismissed); *Mitchell*, 130 F.Supp.2d at 215 (acknowledging continuation of proceedings but facts did not support claim); *Fordham v. Cole*, 1991 WL 718188 (Mass.Super.Ct.1991)(favorably citing continuation of prosecution in context of "initiating" prosecution that terminated in plaintiff's favor on appeal from zoning board decision).

But while none of these cases involve post-conviction misconduct, that is a distinction without a difference on the facts of this case. After his conviction, Salvati filed no fewer than five petitions for commutation of his sentence, an appeal of his conviction to the Massachusetts Supreme Judicial Court, and a motion for a new trial. The complaint does not specify the dates of all these requests, but at least one was post–1974. Limone filed a petition for commutation in 1982 and filed for rehearing on his petition in 1987. Greco applied for commutation of his sentence in 1983

and again in 1986. Throughout the post-conviction proceedings, plaintiffs' attorneys repeatedly demanded exculpatory information, and the defendants repeatedly ignored them. In fact, plaintiffs allege that FBI agents took an active role in impeding their commutations by conveying misinformation to the Parole Board, intimidating its members, and lobbying several different governors to deny the petitions.

Being bad once prior to the date of the FTCA does not give the government the right to be bad forever.[27] And this is especially so when their conduct constitutes not only the passive continuation of the 1968 malicious prosecution, but also a new claim for malicious prosecution for each proceeding in which the government disseminated misinformation and covered-up the real facts.

However one interprets "arise" and "accrue," the post–1974 facts alleged in this case are unique and uniquely egregious. The FTCA's goal of providing a remedy to innocent individuals subjected to abusive government conduct post–1974 can only be served by allowing plaintiffs to proceed with their claims.

### B. *Derivative Claims*

The United States argues that plaintiffs' claims for loss of consortium, intentional infliction of emotional distress, conspiracy, negligent selection, negligent retention, and negligent supervision are barred because they "arise out of" the torts of false imprisonment and malicious prosecution.

27. In *Jones v. City of Chicago*, the Seventh Circuit stated in dicta that "at some point after a person is arrested, the question of whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eighth Amendment's cruel and unusual punishments clause ....)" 856 F.2d at 994 (finding police officers who misrepresented facts and hid ex-culpatory evidence, resulting in mistrial and dismissal of charges, could not be shielded from liability by prosecutor's or grand jury's actions in furtherance of prosecution). Here, the issue is not just the government's continued withholding of exculpatory evidence, but its active denials of plaintiffs' requests for such evidence at each judicial proceeding over a thirty-year period.

These arguments were addressed in part in this Court's prior decision in *Limone*, 271 F.Supp.2d at 363. To the extent that I have not already addressed defendants' arguments, I need not address them here because plaintiffs' malicious prosecution claims are not barred.

### C. Discretionary Function Exception

■ This Court already denied defendants' motion to dismiss based on the discretionary function exception to the FTCA for claims addressing "how to conduct investigations, whom to prosecute, whether to disclose exculpatory evidence, and how to manage informants." *Limone*, 271 F.Supp.2d at 353. Defendants now argue that the discretionary function exception protects them from plaintiffs' claims for negligent selection, retention and supervision of FBI agents. This argument is equally unavailing. The FBI supervisors' actions were not discretionary or policy related.

■ The "discretionary function" exception to the FTCA confers immunity over claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "The purpose of this exception is to 'prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Coyne v. United States*, 270 F.Supp.2d 104, 112 (D.Mass.2003) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)).

The First Circuit described the analytical framework to use when evaluating a "discretionary function" defense:

First, an inquiring court must identify the conduct that allegedly caused the harm. Then, in determining whether Congress sought to shelter that sort of conduct from tort liability, the court must ask two interrelated questions: (1) is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments? If both of these queries yield an affirmative answer, the discretionary function applies and the government is shielded from liability.

*Muniz–Rivera v. United States*, 326 F.3d 8, 15 (1st Cir.2003) (citations omitted).

#### 1. Conduct in Question

Defendants again attempt to immunize their behavior with broad characterizations. Under the government's theory, choices that bear any relationship to the FBI's authority to supervise its employees would be immune from liability. But that is hardly the law. "Courts consistently focus on the particular events that proximately caused the injuries for which recovery is sought, not the broad policy authority pursuant to which particular actions were under taken." *Coyne*, 270 F.Supp.2d. at 115. If it were otherwise, the government could always avoid liability by viewing all of its actions at the highest level of abstraction.

Here, plaintiffs allege that FBI supervisors knowingly allowed (and at worst enabled) FBI agents to assist Barboza in providing false testimony and in working actively to obtain (and sustain) convictions against four innocent men, all to cover up Flemmi's criminal activities. FBI higher-ups, allegedly knowing the facts, even went so far as to recommend commendations for Rico's and Condon's activities in the Deegan investigation.

#### 2. Discretionary Decision

There can be no question that the alleged conduct of the FBI supervisors in this case was not "discretionary" within

the meaning of the statute. And even if it was, it is clear that this is not the sort of discretion that Congress intended to protect.

In *Berkovitz v. United States,* the Supreme Court held:

> [T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

486 U.S. at 536, 108 S.Ct. 1954.

The government mandates conduct in a variety of ways, including "comprehensive regulatory schemes, administration of agency programs, adjudicatory proceedings and internal operating guidelines." *Flax v. United States,* 847 F.Supp. 1183, 1188 n. 6 (D.N.J.1994)(finding discretionary function exception barred claim for negligent surveillance of kidnapping suspects because FBI guidelines described surveillance in very broad terms requiring agents' discretion); *see Irving v. United States,* 162 F.3d 154, 164 (1st Cir.1998) ("informal agency rules and similar pronouncements may at times bind agency personnel for the purposes of discretionary

function exception"); *Coyne v. United States,* 270 F.Supp.2d at 116–18 (finding that accidental revelation of informant's identity and failure to protect his safety did not seem discretionary and could not be assessed prior to discovery of FBI policies and procedures which might bear on conduct). And when those policies or regulations are violated, liability will necessarily follow. *United States v. Gaubert,* 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

Plaintiffs cite several mandatory procedures that were violated by FBI supervisors.[28] *See* Plaintiffs' Joint Opposition pp. 11–14.[29] In particular, FBI policy required:

> 1. MRR § I(1)(A)(1): "Special Agents in Charge (SACs) *must* report immediately any improper conduct of employees in their territory." (Emphasis added.)

This directive is found in the MRR as early as March 29, 1963.

> 2. MRR § I(1)(A)(2): "All employees *must* report immediately neglect of duty or any conduct prejudicial to the best interests of the Bureau . . . ." (Emphasis added).

This directive is found in the MRR as early as March 29, 1963.

> 3. MRR § I(9)(B): "There *must* be no delay in notifying the Bureau concerning any allegations of either misconduct or improper performance of duty on the

---

**28.** These directives are included in the Limone and Tameleo plaintiffs' second amended complaint (attachment A to docket entry # 207), which I have allowed plaintiffs to file. The amendment supplements plaintiffs' negligent supervision claims based on newly discovered facts included in the November 2003 written report to the United States House of Representatives subcommittee investigating the FBI's misconduct in relation to the Deegan murder. As the facts in the report were not available prior to November 2003, plaintiffs have cause to amend.

**29.** According to plaintiffs, the United States has produced during discovery certain editions (and published revisions) of the FBI's Manual of Instruction ("MOI"), Manual of Investigative Operations and Guidelines ("MIOG"), Manual of Rules and Regulations ("MRR"), and Manual of Administrative Operations and Procedures ("MAOP"). The MRR was replaced by the MAOP in 1978. The MOI was replaced by the MIOG in 1977.

part of Bureau personnel." (Emphasis added).

This directive is found in the MRR as early as March 27, 1969.

4. MOI § 1008(IV) "While it is proper for the FBI to use informants in appropriate investigations, it is *imperative* that special care be taken not only to minimize their use but also to *ensure that individual rights are not infringed and that the government itself does not become a violator of the law.*" (Emphasis added).

This directive is found in the MOI as early as January 12, 1977.

5. MOI § 108(IV)(C)(1): *"Under no circumstances* shall the FBI take any action to conceal a crime by one of its informants." (Emphasis added).

This directive appears in the MOI as early as January 12, 1977.

Defendants argue that the guidelines cited by plaintiffs were not mandatory and did not dictate a specific course of conduct. I disagree. At least on their face, these directives required supervisors to report misconduct immediately and ensure that individuals' rights were not violated through the use of informants. The FBI supervisors, so the complaints allege, plainly violated them.

Defendants cite various cases for the proposition that issues of employee supervision and retention generally involve policy judgments and fall within the discretionary function exception. *See, e.g., K.W. Thompson Tool Co., Inc. v. United States,* 836 F.2d 721, 728 (1st Cir.1988)(affirming dismissal of negligent supervision claim because law directing EPA to develop programs for environmental control invoked use of agency discretion); *Attallah v. United States,* 955 F.2d 776, 784–85 (1st Cir.1992)(finding decision whether Cus-

toms Service should undertake the level of supervision or surveillance necessary to predict future criminal conduct by agents was policy judgment). That may be so as a general matter, but not in this case. This case involves far more that the run-of-the-mill employment supervision decisions. It involves an intricate cover-up of illegal behavior made possible by FBI supervisors ignoring or at worst assisting in the illegal conduct of their subordinates.

### 3. *Policy Considerations*

Even if this Court found the supervisory decisions discretionary, that discretion could not possibly have involved the kind of policy decisions that Congress sought to protect. For example, in *Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.1995), the Eighth Circuit found that the discretionary function exception could not apply to a supervisor's failure to act when he had notice of illegal behavior (stealing mail from a patron's box) by a subordinate postal employee. The court held:

> Issues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception. However ... Failure to act after notice of illegal action does not represent a choice based on plausible policy considerations.

60 F.3d at 496 (internal citations omitted).

The same analysis applies a *fortiori* in the case at bar.

## V. UNITED STATES' MOTION TO DISMISS EDWARD GRECO'S CLAIMS

The United States has filed a separate motion to dismiss against plaintiff Edward Greco. Edward Greco is the son of Louis Greco.[30] Only eleven years old at the time

---

**30.** Edward Greco filed an action separate from his mother, Roberta Werner. Roberta

Werner was Louis Greco's wife. Roberta Werner filed an action as the Executrix of the

of is father's conviction, he alleges that he too suffered damages as a result of his father's wrongful conviction, incarceration, and death in prison. He asserts claims under the FTCA and Massachusetts state law for intentional infliction of emotional distress and loss of parental consortium (Counts I, II, V, and VI), civil conspiracy (Count III), and 42 U.S.C. § 1983 claims against state actors (Count VII). The government moves to dismiss on the grounds that (1) plaintiff's intentional infliction of emotional distress claim is (a) time-barred because he failed to present an administrative claim within two years of accrual, or alternatively (b) fails as a matter of law because such emotional distress was not substantially contemporaneous with the alleged outrageous conduct; and (2) plaintiff's claims for loss of consortium and conspiracy fail because the underlying tort on which it is based is not actionable.

## A. *Intentional Infliction of Emotional Distress*

■ Edward Greco's intentional infliction of emotional distress claim is distinct from like claims asserted by the men who were wrongfully convicted.[31] His claims turn on Massachusetts' bystander theory of recovery—the circumstances under which family members who were not the direct victims of a defendant's "outrageous

misconduct" may bring claims stemming from that conduct.

The government asserts two related challenges to Edward Greco's claim based on the amount of time that elapsed between his injury—which they identify as the moment his father was convicted—and his discovery of the malefactors thirty years later. First, the United States argues that bystander liability law requires that Edward Greco suffer severe emotional distress simultaneous with, and as a result of, the defendants' outrageous conduct. Whatever distress Edward felt, they argue, occurred during his father's conviction in 1968; he did not learn of the defendants' hand in it until later. Second, and related, the government argues that the claim is barred by the FTCA's statute of limitations because it accrued at the time of the conviction in 1968.[32]

I reject both of the government's technical traps as detailed below, at least on this record. I will allow Greco's claims to proceed.[33]

### 1. *The Merits of the Claim*

The government argues that Edward Greco's claim for intentional infliction of emotional distress does not meet the "contemporaneous" requirement of bystander liability because he did not know about the FBI's "outrageous conduct" at the time of

---

Estate of Louis Greco and the Executrix of the Estate of Louis Greco, Jr., as well as on her own behalf.

**31.** The government apparently has not asserted these defenses against the other family member plaintiffs, apart from Greco. That is, they have only made the argument that Edward Greco does not qualify for "bystander liability" under the relevant case law.

**32.** Of course, the two arguments are somewhat at odds with one another: On the one hand, the government argues that Greco knew too little about the defendants' role in

his father's conviction at the time it took place to qualify for bystander liability. On the other hand, it argues that he knew enough at the time of the conviction that he should have brought the case when the conviction took place.

**33.** As noted above, claims concerning this misconduct have been brought by Greco's son, Edward, and by his wife, as administratrix of his estate, and in her own right; Henry Tameleo's son, Saverio, as administrator of the Tameleo estate, and in his own right; and Tameleo's wife, Jeanette. Greco and Tameleo died in prison.

his father's trial. Edward Greco counters that he suffered severe emotional distress at the moment of his father's conviction precisely because he knew his father was innocent; his father was in Florida on the night of the Deegan murder. Based on his father's defense at trial, he believed that the FBI was involved in framing him.[34] Alternatively, he argues that the contemporaneous requirement should be waived given the government's misfeasance in concealing its misconduct.[35]

The tort of intentional infliction of emotional distress is of relatively recent vintage. Courts were reluctant to recognize such torts, unaccompanied by physical harm, because emotional distress seemed ephemeral, and so easily contrived. *Heinrich v. Sweet*, 49 F.Supp.2d 27, 39 (D.Mass. 1999). It was difficult to differentiate between "genuine emotional injuries and fictitious ones as well as between those that are serious enough to warrant legal redress and those that are not." Daniel Givelber, The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct, 82 Colum.L.Rev. 42, 44 (January, 1982). Moreover, it seemed inappropriate to provide a "judicial forum for every dispute that leaves someone feeling emotionally abused." *Id.* The remedy for these concerns was, for the most part, the requirement that the defendant's conduct be "extreme and outrageous," beyond what a civilized society would permit.[36] If the defendants' conduct reached that level of malevolence, plaintiff's pain could almost be presumed. Massachusetts has adopted this approach, requiring that direct victims demonstrate:

(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community'; (3)

34. Edward Greco also argues that the contemporaneous requirement is inapplicable here because he was a direct victim of the government's misconduct—that the government knew or should have known that the misconduct directed at Louis Greco would cause Edward Greco severe distress. The claim stretches the concept of "direct victim" to its breaking point. Nor is it clear that Massachusetts law would allow such a claim. For example, in *Anthony H. v. John G.*, 415 Mass. 196, 612 N.E.2d 663 (1993), the victim's younger brother brought a claim against the defendant. Defendant had abused the victim, so he argued, and it was foreseeable that, as a result of defendant's acts, the victim would abuse his brother in the same way. The Court rejected the claim—refusing to characterize it as a direct victim issue at all—even where the jury found the younger brother's abuse was foreseeable to the defendant. Rather, the court put the case in the category of "bystander" liability and rejected it. There was no evidence that the younger brother suffered severe emotional distress upon learning what happened to the victim.

35. Edward Greco also seems to argue that he suffered distress throughout his father's incarceration, contemporaneous with the FBI's continuing cover-up. While I agree that the government's malicious prosecution of the four individuals continued after 1974, as described *supra*, Edward Greco's claim is slightly different. Apart from the distress, he sues for the 1968 conviction. To sue for the post–1974 period he must focus on each individual act. He has not asserted emotional distress claims surrounding each of these incidents. The argument that the government continued to commit misconduct every day while Greco, Salvati, Limone, and Tameleo remained imprisoned is too expansive an interpretation as applied to Edward Greco, a third-party victim.

36. Thus, while the 1934 Restatement of the Law of Torts denied recovery for emotional injury, "even when intentionally inflicted, if the defendant's conduct did not otherwise amount to a tort," that position was reversed by 1948. Givelber, 82 Colum.L.Rev. at 42.

that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it.'

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–145, 355 N.E.2d 315 (1976) (internal citations omitted).

While the Supreme Judicial Court has expanded the tort of intentional infliction of emotional distress beyond the immediate victim to include recovery for family members, they, like all courts, have done so cautiously. In addition to concerns about emotional distress claims in general, family member claims raise concerns about an expansive group of plaintiffs, creating the need to limit the scope of liability to a finite class of potential plaintiffs. *Migliori v. Airborne Freight Corp.*, 426 Mass. 629, 631, 690 N.E.2d 413 (1998). As the court noted in *Migliori*, "[e]very injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit, legal consequences of wrongs to a controllable degree." *Id.* (quoting *Tobin v. Grossman*, 24 N.Y.2d 609, 619, 301 N.Y.S.2d 554, 249 N.E.2d 419 (1969)).[37]

The solution was to require that certain objective tests be met before a bystander-family member could bring the claim. Clearly, a family member could claim damage if he or she were actually present when the defendant's extreme and outrageous conduct took place. Restatement (Second) of Torts § 46(2) (1965); *Nancy P. v. D'Amato*, 401 Mass. 516, 522, 517 N.E.2d 824 (1988) (adopting § 46(2) in Massachusetts).[38] But the Supreme Judicial Court recognized that actual presence could place the bar too high. It suggested, indeed, that where the wrongful conduct was intentional or reckless, the presence requirement might be reconsidered. *Id.* In any case, with or without presence, the court required "both (a) substantially contemporaneous knowledge of the outrageous conduct and (b) a severe emotional response." *Id.; Anthony H. v. John G.*, 415 Mass. at 199, 612 N.E.2d 663.

The question here is how to apply the "substantially contemporaneous" requirement in this case. What was it that Edward Greco had to know, and when, in order to qualify: Was it enough to suffer distress because of the *conviction itself*, or did he need to know it was a *wrongful* conviction (because he in fact knew his father to be innocent), or a *wrongful con-*

---

**37.** As one commentator said:

> This limitation [of presence] may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of a Presidential assassination is virtually unlimited and the distress of a woman who is informed of her husband's murder 10 years afterward may lack the guaranty of genuineness which her presence on the spot would afford.

Restatement (Second) of Torts § 46 cmt. 1 (1965). At the same time, the Restatement drafters leave open the possibility of a broader rule:

> The Institute expresses *no opinion as to* whether there may not be other circumstances under which the actor may be sub-

ject to liability for the intentional or reckless infliction of emotional distress.

Restatement (Second) of Torts § 46 caveat 1 (1965).

**38.** Restatement (Second) of Torts § 46(2) states:

> Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time, if such distress results in bodily harm.

viction for which the FBI was the likely culprit, or did he need to know that is was a *wrongful conviction actually caused by FBI misconduct?*

The government argues that Greco's distress had to be caused by actual knowledge of the FBI's misconduct in suborning perjury during his father's trial, information which he did not have until later. *See Zachary v. Centrus Premier Home Care, Inc.*, 1999 WL 1295110, *2 (Mass.Super.Oct.15, 1999)(permitting negligent infliction of injury claim to proceed without presence of family member at the time of the injury, rejecting intentional infliction claim because knowledge of the outrageous conduct did not happen until the day after the conduct.)

I disagree. There can be no doubt that the FBI's conduct in framing Greco's father for a crime he did not commit—if proved—was outrageous, beyond civilized standards. Greco did not know the FBI's involvement precisely at the moment his father was sentenced to death, but he suspected as much. He knew that his father had been in Florida at the time of Deegan's murder, and he suspected FBI involvement. All of the concerns that the SJC had when it applied the "contempora-

neous" requirement are satisfied by the facts here: Greco is not a member of an expansive class of plaintiffs, far outside the zone of foreseeable victims of the government's "outrageous" conduct. Nor are his claims frivolous or contrived. It is difficult to imagine conduct more outrageous, more removed from what this country stands for, than the conduct alleged here.

Moreover, Greco's situation is distinguishable from those addressed by the Massachusetts courts, where bystanders, who had absolutely no knowledge of the harm at the time it occurred, experienced distress later. In *Nancy P.*, the Supreme Judicial Court affirmed the dismissal of a mother's claim for intentional infliction of emotional distress based on the defendant's sexual abuse of her daughter. The mother *did not know that the abuse had occurred at all* until one year after the incident.[39]

In *Heinrich v. Sweet*, the court also dismissed family members' claims for intentional infliction of emotional distress. The family members suffered distress when they discovered that their relatives had been subjected to involuntary medical experimentation *thirty or forty years before*. 49 F.Supp.2d at 39–40.[40] At the

---

**39.** Even in *Nancy P.*, where the "substantially contemporaneous" requirement was first outlined, the court based its ruling on the lack of evidence of severe distress. It laid "little stress on the absence of substantially contemporaneous knowledge," because the defendant told the victim not to divulge his conduct. *Nancy P.*, 401 Mass. at 522, 517 N.E.2d 824. Likewise, I am inclined to place less emphasis on an alleged lack of contemporaneous knowledge because of the government's active concealment of its misconduct. Indeed, Edward Greco's argument that the contemporaneous requirement should be waived entirely because of the active concealment of the outrageous conduct is persuasive. In *Quinn v. Walsh*, 49 Mass.App.Ct. 696, 732 N.E.2d 330 (2000), for example, the Appeals Court recognized in dicta that where the

harm is inherently unknowable, and thus the statute of limitations is tolled, the court may not apply the contemporaneous injury requirement. 49 Mass.App.Ct. at 699, 732 N.E.2d 330. While the context was different, the rationale is applicable here. The courts' goal of limiting fraudulent claims and an expansive plaintiff class does not comport with denying rightful claims for outrageous behavior that was concealed intentionally from the plaintiff.

**40.** Analyzing the claims with a combination of New York and Massachusetts law, the court found that the plaintiffs did not experience " 'contemporaneous knowledge' of the *injury* " (New York's more liberal standard) and a severe emotional response. *Id.* at 39, 732 N.E.2d 330.

time of the experimentation, however, the plaintiffs did not know of the misconduct.

### 2. *Statute of Limitations*

■ If Greco knew enough about the defendants' wrongful conduct in 1968 to satisfy the requirements of the bystander claims, so the government argues, he should have sued two years after he had attained the age of majority.[41] Indeed, the government suggests that Greco's argument that he knew enough to maintain his emotional distress claim and did not know enough to bring suit are mutually exclusive.

These challenges are analytically distinct. One addresses when the elements of the cause of action were met. The other challenges Greco's diligence in bringing suit. The statute of limitations rules and the rules limiting the scope of intentional infliction of emotional distress claims are not mirror images of each other. They were created to address very different concerns and eliminate potential claims for very different reasons. That they both speak in terms of "time" does not mean they represent points along a single line.

Edward Greco does not contest the fact that he did not present his administrative claim to the FBI until June 10, 2002. He contends, with reason, that he did not remotely have enough information to sue anyone until 2000, when the government was forced to disclose what it had done.

■ Under the FTCA's statute of limitations, a tort claim brought against the United States is "forever barred" unless it is presented in writing to the appropriate federal agency within two years after the claims accrues. 28 U.S.C. § 2401(b). It is a jurisdictional prerequisite. *Skwira v. United States*, 344 F.3d 64, 71 (1st Cir.2003). Moreover, the statute of limitations must be strictly construed. *Kubrick*, 444 U.S. 111, 117–118, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

Here, the case law the government cited earlier—when a claim "accrues"—is relevant. While a tort claim generally accrues at the time of the plaintiff's injury, *Kubrick*, 444 U.S. at 120, 100 S.Ct. 352, in certain circumstances, courts have tolled the running of the statute of limitations. Edward Greco argues that the statute should be tolled by the discovery rule, by the doctrine of equitable tolling, and because of the government's fraudulent concealment of the truth.

I agree. In 1968, Edward Greco had only his strong suspicions but no proof of what the FBI had actually done; he could not get the proof until 2000 because of the FBI's continuing malfeasance.

### a. *The Discovery Rule*

The United States argues that Edward Greco knew or should have known of the FBI's alleged subornation of perjury through Barboza at the time the trial and conviction based on two facts: Edward Greco knew that his father was in Florida on the night of the Deegan murder and further, his father's defense was that the FBI manipulated Barboza's testimony. Edward Greco counters that even assuming these facts to be true, knowing that his father was innocent and believing his father's defense, is not the same thing as having proof sufficient to bring a suit. Indeed, the government's position is profoundly disingenuous. Had Edward Greco sued earlier, when the government was actively deceiving everyone, including parole boards, not to mention governors, the effort would have been fruitless. I agree with the plaintiff; the discovery rule justifies filing the claim in 2002.

---

41. The statute of limitations would not have begun to run until Edward Greco reached the age of majority, approximately seven years after his father's conviction.

Although the Supreme Court recognizes application of the discovery rule in cases involving concealment, medical malpractice, and latent disease, it has not explicitly barred the use of the discovery rule in cases like Edward Greco's. *See generally McIntyre v. United States,* 367 F.3d 38 (1st Cir. May 10, 2004); *see also Skwira,* 344 F.3d at 74–75. Under the rule, a claim accrues once a "plaintiff knows, or in the exercise of reasonable diligence should have known, the factual basis of the cause of action, including the fact of the injury and the injury's causal connection to the government." *Cascone v. United States,* 370 F.3d 95, 104 (1st Cir. May 27, 2004); *McIntyre,* 367 F.3d at 60; *see also Skwira,* 344 F.3d at 82–83. Whether a plaintiff, in the exercise of reasonable diligence, should have discovered the necessary facts is an objective inquiry. *Cascone,* 370 F.3d at 104. "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." *McIntyre,* 367 F.3d at 52 (emphasis in original omitted) (quoting *Kronisch v. United States,* 150 F.3d 112, 121 (2d Cir. 1998)).

In *Bennett v. F.B.I.,* 278 F.Supp.2d 104 (D.Mass.2003), the court rejected a statute of limitations argument in a similar FBI cover-up. The plaintiff, administrator of the estate of an individual allegedly killed by Flemmi in 1967, sued the FBI for wrongful death based on FBI agents' involvement in the murder and cover-up of Flemmi's involvement. The government argued that the admission by the decedent's son that he witnessed FBI agents visit his family home and threaten his father days before the murder signaled that the son immediately suspected the FBI's involvement. To the contrary, the Court found that although the plaintiff believed that Flemmi and Salemme killed his father during the late 1960s (they had been indicted but charges were dropped), the "knowledge of the identity of the immediate tortfeasors did not then put the plaintiff ... on notice that the FBI might have some responsibility for [the] death. After all, the FBI is generally thought to be concerned with *law enforcement* and not an outlaw itself." *Bennett,* 278 F.Supp.2d at 110 (emphasis in original).

In *McIntyre,* the First Circuit supported this conclusion—that a plaintiff must be on notice of the government's involvement—in the same FBI cover-up context. 367 F.3d at 54–57. The facts in *McIntyre* were even more specific than those offered here—numerous news reports and a court hearing describing Flemmi and Bulger's involvement in decedent's (an FBI informant) murder, the FBI had compromised an investigation of Flemmi and Bulger, and the FBI had leaked other informant identities to Flemmi and Bulger. However, the Court tolled the statute of limitations as to the estate of McIntyre because even a reasonable inquiry based on these facts would have been thwarted by the FBI's unwillingness to release information.[42] *Id.*

Here, Edward Greco may have believed in his father's innocence at the time of

---

42. The Court held the statute of limitations should not be tolled as to another plaintiff, the estate of Wheeler, who did know the last piece of information necessary to file suit. Both plaintiffs knew that Flemmi had murdered their family member. The McIntyre estate's claim, however, was based on the fact that the FBI had revealed to Flemmi that McIntyre was an informant—a fact plaintiff did not know more than two years before filing suit. The Wheeler estate's claim was based solely on the FBI's failure to properly supervise Flemmi as an informant and disclose his conduct after it was committed—a fact known more than two years before suit was brought. *Id.* at 57–61, 732 N.E.2d 330.

trial. He may have believed that Barboza committed perjury, and even suspected, based on his father's defense, that the FBI had a hand in it. But he could not have known—the facts as alleged are so shocking—that the FBI was enabling, encouraging, and covering up the perjury. Indeed, like the plaintiffs in *Bennett* and *McIntyre,* Edward Greco could not have discovered the truth until 2000 no matter how hard he worked at it. The FBI's involvement was "inherently unknowable" even "incapable of detection by the wronged party through the exercise of reasonable diligence." *Gonzalez v. United States,* 284 F.3d 281, 288–89 (1st Cir.2002); *see also Attallah v. United States,* 955 F.2d at 780 (applying discovery rule where government agents were indicted for underlying crime over four years after committed because plaintiffs could not discover government involvement, especially where police did not have sufficient information to bring charges for four years.) [43]

**b. *Equitable Tolling and Fraudulent Concealment* [44]**

 The same analysis applies to Edward Greco's claim of equitable tolling. The rebuttal presumption of equitable tolling applies to suits against the United States. *See Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *Gonzalez,* 284 F.3d at 291–93 (analyzing whether FTCA statute of limitations was equitably tolled but rejecting plaintiff's arguments on factual grounds). The doctrine "suspends the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *Gonzalez,* 284 F.3d at 291. The similar doctrine of fraudulent concealment tolls the statute of limitations "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." *Salois v. Dime Sav. Bank of New York, FSB,* 128 F.3d 20, 25 (1st Cir.1997). The First Circuit has outlined the two conditions under which the statute will be tolled:

> First, the defendant raising the limitations defense must have engaged in fraud or deliberate concealment of material facts related to the wrongdoing. Second, the plaintiff must have failed to discover these facts within the normal limitations period despite his or her exercise of due diligence.

*Gonzalez,* 284 F.3d at 292.

The Greco complaint meets these tests. The statute of limitations should be tolled until 2000—when the information was finally made available—making Edward Greco's claim timely.

**B. *Loss of Consortium***

 An action for loss of consortium may be maintained under Massachusetts law where such loss is shown to arise

---

**43.** The cases relied upon by the government do not alter this result, because the plaintiffs in those cases were aware of the government's misconduct at the time of their injuries. *See Brown v. Nationsbank Corp.,* 188 F.3d 579 (5th Cir.1999)(finding statute of limitations accrued when government agents revealed scheme in which they had involved plaintiff and tried to convince him to become an informant through threats and intimidation); *Mitchell v. City of Boston,* 130 F.Supp.2d 201, 214 (D.Mass.2001)(finding plaintiff on notice of claim at time of trial, conviction, and incarceration because he witnessed government agent falsely testify to statements made by plaintiff himself regarding commission of crime).

**44.** The equitable tolling and fraudulent concealment analyses are parallel. In the former, the plaintiff could not have discovered the facts essential to his suit. In the latter, the plaintiff could not have discovered the facts because the defendant was involved in concealing them.

from tortious injury to one's family member caused by a third party. *See Agis*, 371 Mass. at 146, 355 N.E.2d 315; *Mouradian v. General Elec. Co.*, 23 Mass.App.Ct. 538, 544, 503 N.E.2d 1318 (1987). The government argues that a loss of consortium claim cannot be based on the tort of malicious prosecution and that Edward Greco's claim in particular must fail because it is based on his father's malicious prosecution claim that did not survive his death.

■ The government relies on *Suarez v. Belli*, 1997 WL 39918 (Mass.Super.Jan.13, 1997), in which the court noted that it is "not aware of any authority that would permit loss of consortium damages for the ... malicious prosecution claims against [the defendant]." But the court did not explain its conclusion, much less cite to supporting authority. And it flies in the face of other trends in Massachusetts law. For example, while other courts have limited loss of consortium claims to those involving an underlying claim for physical damages to the wronged spouse, *see Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288 (Tex.1994), Massachusetts has not. It allows for loss of consortium damages based on a spouse's non-physical injuries. *See Agis*, 371 Mass. at 146–47, 355 N.E.2d 315 (allowing a husband's loss of consortium claims deriving the wife's claim against former employer against the wife); *Suarez*, 1997 WL 33918 at *4 (allowing loss of consortium recovery based on intentional infliction of emotional distress).

■ Indeed, even though the tort of loss of consortium is "derived from the marital relationship and the rights attendant upon it," Prosser and Keeton on Torts (5th Ed.1984) at 932, Massachusetts later expanded it to include claims by children

as well. *See also, Ferriter v. O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980) (recognizing child's claim for loss of parental society and for mental anguish deriving from employer's negligence and observations of their father's pain).[45] *See* also Prosser and Keeton *supra* at 931. While the most clear cut injuries that would deprive a family member of services are physical injuries to a parent, a spouse or child should be able to recover for other torts, including malicious prosecution, so long as an actual loss of consortium resulted. *Id.* at 932.

Numerous courts outside the jurisdiction have recognized the wisdom of this position. *See Minion v. Gaylord's International Corp.*, 541 So.2d 209 (4th Cir.1989) (children could recover for loss of consortium based on mother's malicious prosecution claim without physical injury to mother); *Lynch v. Omaha World–Herald Co.*, 2003 WL 21339670 (D.Neb. June 10, 2003) (allowing loss of consortium recovery for malicious prosecution because claim should not necessitate physical injury); *Rivers v. EX–CELL–O Corp.*, 100 Mich.App. 824, 300 N.W.2d 420 (1980); *Zalewski v. Gallagher*, 150 N.J.Super. 360, 375 A.2d 1195 (1977); *Dunn v. Ala. Oil & Gas Co., Inc.*, 42 Tenn.App. 108, 299 S.W.2d 25 (1957).

Edward Greco clearly has alleged the loss of his father's services. His father was physically removed from the family for over twenty years, before he died in prison. He could not enjoy a normal relationship with his father and his father's financial support.

The government also argues that the loss of consortium claim cannot stand after the underlying claim has been extinguished by the parent's death.[46] I need

---

**45.** Much of *Ferriter* was superceded by St.1985, c. 572, § 35, effective December 10, 1985, insofar as it applied to Worker's Compensation claims.

**46.** This argument—whether malicious prosecution claims survive the death of the victim, either under the FTCA or as a component of a constitutional claim—has not been raised by the government in connection with the cases

not decide whether a malicious prosecution claim survives Louis Greco's death at this time. Edward Greco is not asserting a derivative claim for malicious prosecution. Edward Greco is seeking redress for *his* injury, not his father's. I disagree with the government's argument that any cause of action simply relating to malicious prosecution necessarily requires that I decide this issue. In any case, even if Louis Greco's malicious prosecution claim does not survive death, that should only mean that his estate cannot recover for the tort against him. It should not bar the introduction of proof regarding the malicious prosecution in the context of an independent claim of emotional distress by his son, or loss of consortium claims by other family members.

■ The Supreme Judicial Court has held that a "claim for loss of consortium is independent of the damage claim of the injured spouse" because each spouse is "enforcing an independent right." *Feltch v. General Rental Co.*, 383 Mass. 603, 607–08, 421 N.E.2d 67 (1981) (and cases cited). Thus, a plaintiff claiming loss of consortium need not surmount the defenses asserted against the injured party. *See id.; Worcester Ins. Co. v. Fells Acres Day School, Inc.*, 408 Mass. 393, 414, 558 N.E.2d 958 (1990) (rejecting contention that parent's loss of consortium claim based on assault of child was barred by insurance policy language affecting validity of child's claim); *Feltch*, 383 Mass. at 607–08, 421 N.E.2d 67 (finding wife's loss of consortium claim was not subject to same defenses—here contributory negligence—as husband's negligence claim). If it is the case that Edward Greco's father may not bring the underlying malicious prosecution action because he died in jail, that would

not prevent Edward Greco from asserting his independent rights.

### C. *Civil Conspiracy*

■ The United States argues that Greco's civil conspiracy claim should be dismissed first, because the underlying torts fail and second, because the United States and its employees constitute a single legal entity that cannot conspire with itself. As to the first claim, the government's argument fails because Edward Greco has asserted valid underlying actions.

The second theory also fails. Under the intercorporate conspiracy doctrine, a corporate officer cannot be held to conspire with his own corporation. The idea is that a corporation cannot conspire with its own employees insofar as they are acting for the corporation. The First Circuit has held that the exception should *not* be read broadly because

> [t]he cases employing it have rested in large part on precedent drawn from the antitrust field, where considerations underlying the need for an 'intracorporate' exception to ordinary conspiracy principles are very different. The evil at which the 'conspiracy' section of the Sherman Act, 15 U.S.C. § 1, is aimed is an evil that exists only when two different business *enterprises join* to make a decision, such as fixing a price, that in a competitive world each would take separately. Moreover, an individual decision to do the same thing is not only legitimately socially useful but also may often require joint decision-making by managers within a single enterprise.... Indeed, we do not see why [the exception] should extend—if at all—beyond the ministerial acts of several executives

brought by other family members as administrators or administratrices of the estates of Tameleo or Greco. Thus it has not been fully

briefed by the plaintiffs—apart from Edward Greco—directly affected by it.

needed to carry out a single discretionary decision.

*Stathos v. Bowden,* 728 F.2d 15, 20–21 (1st Cir.1984) (emphasis in original) (internal citations omitted).

Courts have refused to apply the exception in situations such as that alleged by Edward Greco. *Id.* (finding exception did not apply to § 1985(3) conspiracy claim for employment discrimination by municipal officers); *Broderick v. Roache,* 1992 WL 512164 (D.Mass. Oct.22, 1992) ·(refusing to apply exception where defendant police officers engaged in pattern of harassment and retaliation to limit plaintiff's speech). The FBI allegedly engaged in a series of actions to cause Edward Greco emotional distress and loss of consortium and continued to conceal their actions for decades. This activity can hardly be labeled as a ministerial act to carry out a single decision.

Thus, the United States' motion to dismiss claims by Edward Greco is **DENIED.**

## VI. *CONDON'S AND WALSH'S MOTIONS TO DISMISS*

Defendants Condon and Walsh move separately to dismiss the claims against them. Specifically, Condon, an FBI agent, moves to dismiss the *Bivens* claims, asserted by the family members of Peter Limone and Enrico Tameleo because the families do not allege conduct that was intentionally directed at interfering with the family relationship as required by the First Circuit [Limone docket entry # 217].[47] Condon asserts the same defense against Joseph Salvati's family members, and additionally moves that the Salvati complaint be dismissed based on Condon's qualified and/or absolute immunity [Salvati docket entry # 17]. Defen-

dant Walsh, a Boston Police Officer, asserts identical arguments in support of dismissing the § 1983 claims asserted by Joseph Salvati's family members [Limone docket entry # 221].

For the reasons discussed below, Walsh's motion is **GRANTED,** Condon's motion against the Limone and Tameleo family members is **GRANTED,** and Condon's motion against the Salvati plaintiffs is **GRANTED in part and DENIED in part.**

### A. *Claims by Family Members*

■■■ Condon and Walsh argue that the family member plaintiffs (wives and children of the individuals who were themselves maliciously prosecuted) in the Limone/Tameleo and Salvati actions have failed to state actionable *Bivens* claims against Condon and a § 1983 claim against Walsh because the conduct they allege was not directly aimed at severing or affecting their familial relationships.

The law with respect to constitutional causes of action (under *Bivens* for the federal officials, and § 1983 for state officials) is quite different from that concerning state tort actions under the FTCA. Under First ·Circuit law family member claims of the sort alleged here cannot stand. In *Valdivieso Ortiz v. Burgos,* 807 F.2d 6, 8 (1st Cir.1986), the First Circuit made ·clear that governmental action that affects a family relationship only incidentally is not a sufficient basis for a constitutional due process claim. ·The Court affirmed the district court's granting of summary judgment for defendants on a § 1983 claim brought by the stepfather and siblings of an inmate beaten to death by prison guards because the family did not have a constitutionally protected inter-

---

**47.** Condon also moved to dismiss claims by Edward Greco on this ground [Limone docket entry # 203]. This motion is moot because Edward Greco voluntarily dismissed his

claims against Condon [docket entry # 212] and Walsh [docket entry # 227]. None of Louis Greco's other family members assert *Bivens* claims on their own behalf.

est in the companionship of their son and brother. 807 F.2d at 8.

The Court noted that the Supreme Court has only protected the parent-child relationship in two types of situations: First, when the government interferes with certain particularly private family decisions—whether to procreate, whether to school one's children in religious as well as secular matters, defining the "family" with whom one chooses to live—and second, when the government interferes with the rearing of young children. *See Valdivieso Ortiz,* 807 F.2d at 8. Neither interest was implicated in *Valdivieso Ortiz,* nor is it at issue here. *See also Soto v. Flores,* 103 F.3d 1056, 1062 (1st Cir.1997); *Gonzalez Rodriguez v. Alvarado,* 134 F.Supp.2d 451, 452 (D.Puerto Rico, 2001); *Manarite v. Springfield,* 957 F.2d 953, 960 (1st Cir., 1992) (holding that a daughter had no liberty interest protected by the due process clause in her familial relationship with her father in the absence of state interference with "certain particularly private family decisions" (*citing, e.g. Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)) or a state attempt to change or affect the relationship of parent and child in furtherance of a legitimate state interest (*citing, e.g. Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois,*

405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972))).[48]

 The Salvati plaintiffs attempt to shoehorn their claims into a *Bivens* or § 1983 paradigm by alleging that Condon and Walsh conspired to deprive them of their right to free access to courts.[49] Specifically, they allege that the cover-up conspiracy:

> preclud[ed] plaintiffs from learning the bases of their instant claims for relief; submitting, among other things, administrative claims for relief upon the FBI ... and proceeding thereafter to the courts, to secure civil judgments and damages, on all claims, demands and causes of action which lie against all those responsible and otherwise answerable for the wrongful conviction of Joseph Salvati ....

Plaintiffs are correct that there is a constitutional right of access to the courts. *See Downes v. Bidwell,* 182 U.S. 244, 282, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Rogan v. City of Boston,* 267 F.3d 24, 28 (1st Cir. 2001). The right is grounded in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses. *See Christopher v. Harbury,* 536 U.S. 403, 415, n. 12, 122 S.Ct. 2179, 153 L.Ed.2d 413. In a so-called "backward-looking" denial of access to courts claim,[50] "the official acts

---

**48.** If the parent-child relationship does not create due process rights, clearly the spousal relationship will not. The Supreme Court simply has not protected the relationship between marital partners the way it has the relationship between parents and their children in cases like *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and *Moore,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531.

**49.** They also claim that Condon and Walsh conspired to deprive them of their right to property, but that argument must either be

grouped with access to courts (on the theory that they could have won money based on state law claims), or with their loss of the relationship (on the theory that Salvati would have provided them with money himself).

**50.** The other category of access claims identified by the Court is "forward looking" because the claim has not been lost, just frustrated by systematic official action to prevent the preparation or filing of suits—prisoner's access to a law library to prepare a case, a reader for an illiterate prisoner, a lawyer, a

claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief". *See id.* at 414, 122 S.Ct. 2179 (internal citations omitted).

However, where the right to access is ancillary to the underlying claim, "without which a plaintiff cannot have suffered injury by being shut out of court," *id.* at 415, 122 S.Ct. 2179, the Supreme Court requires that the underlying cause of action be described specifically in the complaint, so as to provide notice to the defendant and an opportunity to challenge its viability. *See id.* at 416, 122 S.Ct. 2179.

The complaint of the Salvati plaintiff family members is not sufficient. General statements regarding the "civil judgments and damages, on all claims, demands and causes of action which lie against all those responsible," do not meet the level of specificity required by the Supreme Court. *See id.* (rejecting *Bivens* claim by widow of murdered Guatemalan citizen tortured by captors affiliated with CIA and subjected to federal officials' concealment of information about husband for lack of specificity in identifying underlying cause of action and remedy not currently available); *Estate of Halloran v. United States*, 268 F.Supp.2d 91, 97 (D.Mass.2003) (estate of individual killed by Flemmi failed to state denial of access claim because general statement that "estate was deprived its right to seek a civil remedy from 1982 to the date of this Complaint" was insufficient under *Harbury* ).[51]

Therefore, Walsh and Condon's motions to dismiss the *Bivens* claims individually asserted by the Limone, Salvati, and Tameleo plaintiff family members are **GRANTED**. These motions do not affect the claims asserted directly by Peter Limone, Enrico Tameleo, and Joseph Salvati or their representatives in any way.

### B. *Qualified and Absolute Immunity on all Bivens Claims*

■ Condon also argues that based on an individual analysis of the specific conduct alleged against him that he is entitled to qualified immunity because *his* alleged conduct did not violate any Constitutional rights that were clearly established at the time of the alleged offenses. Specifically, he claims qualified immunity for non-disclosure of *Brady* materials and allegations relating to false testimony. He also claims absolute immunity for his trial testimony.

I have already addressed the issues of qualified and absolute immunity for all of the defendants, including Condon, in my prior decision, *Limone*, 271 F.Supp.2d at 365–68, which was upheld by the First Circuit. *Limone*, 372 F.3d 39. While the Salvati plaintiffs were not party to the prior motion to dismiss, the same reasoning clearly applies.

Condon's argument that his specific behavior warrants a different finding than that already reached by this Court is not remotely persuasive. The Salvati complaint specifically alleges that Condon (1) was partners with Rico in November 1965; (2) Rico and Condon were both members of the joint federal/state task force investigating the Deegan murder; (3) Rico, Con-

---

challenge to an excessive filing fee, etc. *See Harbury*, 536 U.S. at 413, 122 S.Ct. 2179.

**51.** The Limone/Tameleo plaintiffs filed a response to Condon's motion [docket entry # 243] citing cases from other jurisdictions, *see, e.g., Baker v. Putnal*, 75 F.3d 190 (5th

Cir.1996); *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir.1991); *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984), to support the family members claims, but recognizing that the First Circuit has rejected these arguments.

don, and other FBI agents failed to follow proper procedures and guidelines with respect to the selection, approval, and monitoring of James Flemmi and Steven Flemmi as informants; (4) in March 1967 Rico and Condon targeted Barboza as an informant; (5) Rico and Condon had multiple meetings with Barboza; (6) Barboza told Rico and Condon that he would not implicate James Flemmi but would implicate Salvati; (7) Rico and Condon assisted the Suffolk District Attorney in connection with the trial, in particular preparing Barboza to testify; (8) Rico and Condon were present at a meeting between Barboza and Stathopolous where the two coordinated their testimony against Salvati; (9) Condon testified in the Deegan murder trial that he believed Barboza's testimony was "pure" and that he had done everything in his power to ensure that; (10) Rico and Condon provided Barboza as a witness knowing he would falsely implicate Salvati; and (11) in 1971 Rico and Condon went to California to intercede on Barboza's behalf in criminal charges against him in an effort to ensure Barboza's continued silence regarding his false testimony in the Deegan murder trial.

In addition to the allegations discussed in my prior opinion, these facts asserted in the Salvati Complaint are sufficient to survive a motion to dismiss. Condon's renewed attempt at a shriveled caricature of the facts does not affect my prior findings. Therefore, Condon's motion to dismiss all of the claims against him on immunity grounds is **DENIED.**

## VII. *CONCLUSION*

For the foregoing reasons, the United States' motions to dismiss [Limone docket entry # 183, Salvati docket # 6, and Greco docket entry # 7] are hereby **DENIED.** Walsh's motion is **GRANTED** (Limone docket entry # 221). Condon's motion against the Limone and Tameleo family members is **GRANTED** (Limone docket

entry # 217), and Condon's motion against the Salvati plaintiffs is **GRANTED in part and DENIED in part** (Salvati docket entry # 17).

SO ORDERED.